# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAKE CHARLES DIVISION

| | | |
|---|---|---|
| WILLIAM D. THURMAN | : | DOCKET NO. 2:06-cv-437<br>Section P |
| VS. | : | JUDGE MINALDI |
| LOUISIANA DEPARTMENT OF<br>PUBLIC SAFETY AND<br>CORRECTIONS, ET AL. | : | MAGISTRATE JUDGE WILSON |

## REPORT AND RECOMMENDATION

Currently before the court is a "Motion for Summary Judgment" [doc. 32] filed on behalf of
the defendants.  This matter has been referred to the undersigned magistrate judge for review, report,
and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B).

## FACTUAL SUMMARY and PROCEDURAL HISTORY

This civil rights action was filed on behalf of plaintiff on March 17, 2006.  In the complaint,
the plaintiff alleged that he is a diabetic who was transferred to Allen Correctional Center on or
about September 1, 2005 for the purpose of obtaining medical treatment for a venous statis ulcer on
his right calf.  He claimed that since his transfer he had been denied previously prescribed insulin
and blood pressure medication and that he had not received adequate treatment for his ulcer.
Specifically, he claimed that he was denied any treatment for two months after his transfer and that
finally on or about November 25, 2005, he was allowed to go to the infirmary for a bleach bath and
was given bandages to change himself.   He further alleged that on December 10, 2005, he was
placed in Administrative Segregation for an alleged escape attempt and that while in lock down, he
received no medical care.  This lack of medical care allegedly resulted in an infection which

developed into boils in his groin area which ultimately required surgery in January, 2006.  Following

his return to Allen Correctional Center after surgery at the Huey P. Long Hospital in Alexandria,

Louisiana, plaintiff alleged that the Dr. Barbara T'Hart refused to give him the prescribed antibiotics

or pain medication or to provide prescribed bleach baths for the plaintiff's infected areas.  Plaintiff

further alleged that on March 15, 2006, he noticed another boil growing on the back of his neck.

This civil rights action followed this discovery. Plaintiff claims that he has suffered a substantial

injury and deterioration of his health and medical condition as a result of the defendants' deliberate

indifference to his serious medical needs.

Incorporated in the complaint was a request for injunctive relief.  Specifically, the plaintiff

sought to have the court order the defendants to:

1.    Provide him with proper, necessary, and adequate treatment for his serious medical
      needs, including but not limited to, providing plaintiff with the proper dosages of
      previously prescribed medications and providing immediate treatment to the venous
      statis ulcers on plaintiff's leg as well as change of bandages and prescribed therapies
      such as bleach baths, etc.; and

2.    Provide all medical records of plaintiff to Dr. Eugene Berry, M.D. and to further
      authorize Dr. Berry to visit the plaintiff at defendants' facility in order to allow Dr.
      Berry to examine the plaintiff after a review of the plaintiff's medical records as soon
      as possible.

Following an initial review of the complaint, the undersigned issued an Order to Show Cause,

requiring the Warden to file a written response to the plaintiff's allegations regarding the lack of

medical care and setting a hearing on April 19, 2006 to determine whether plaintiff was entitled to

the injunctive relief sought. [doc. 4].  Prior to this hearing, a telephone conference was held with the

undersigned wherein the parties agreed that plaintiff's personal physician would be allowed to

examine the plaintiff at Allen Correctional Center at plaintiff's expense.  The physician was to

prepare a report following the examination.  Accordingly, the hearing was upset pending plaintiff's

medical examination and physician report.  It was further agreed that following receipt of the medical report, plaintiff's counsel would initiate another telephone conference with the undersigned and opposing counsel if he felt a hearing was still necessary.  *See* Docket entry dated 4/13/06.  On June 7, 2006, an order was signed allowing plaintiff to be examined by his physician of choice, Dr. William Dupon, at Allen Correctional Center on any Wednesday agreed to by the defendant. [doc. 15].  On August 25, 2006, a Motion to Reset Hearing was filed on behalf of the defendant. [doc. 18].  This motion was granted by the undersigned, and a hearing was set for September 13, 2006. [doc. 19].  A joint motion to continue the hearing followed, and the hearing was reset to October 19, 2006. [docs. 21, 22].  On October 16, 2007, the plaintiff filed another motion to reset the hearing.  This motion was granted, and the hearing was reset to January 30, 2007. [docs. 24, 25].  On January 22, 2007, the plaintiff filed a third motion to reset the hearing.  This motion was granted, and the hearing was reset to March 27, 2007. [docs. 27, 28].

On March 9, 2007, a telephone status conference was held with the undersigned.  During the conference, it was determined that the hearing would be upset, and the undersigned put the parties on notice that he was considering recommending a *sua sponte* summary judgment in favor of the defendants.  The plaintiff was ordered to come forward with summary judgment evidence to support an Eighth Amendment claim. [doc. 31].

The parties have responded to the undersigned's notice, and the defendant has filed a motion for summary judgment.  Plaintiff has filed an opposition to the motion for summary judgment, and the plaintiff's medical records have been produced as well as other summary judgment evidence in support of their respective positions.

In their motion for summary judgment, the defendants argue that plaintiff has failed to show

that he suffered a physical injury as the result of inadequate medical care by the defendants, and they deny that they acted with deliberate indifference to plaintiff's serious medical needs.  In support of these arguments, the defendants point to the plaintiff's medical records and to the deposition testimony of the examining physician selected by plaintiff.

As stated above, the plaintiff alleges that following his transfer to Allen Correctional Center on September 1, 2005, he was seen not seen by a doctor for over two months.  He further claims that other than the November 25, 2005 trip to the infirmary, he received no further medical evaluations or treatments until he was admitted to the Huey P. Long Hospital in January, 2006.

A review of plaintiff's medical records offered into evidence reveals that on August 31, 2005, the day before plaintiff was transferred to Allen Correctional Center, he was seen in the infirmary at Washington Correctional Institute for a variety of complaints, including swollen testicles, a venous statis ulcer on his right leg, and diabetes.  The medical notes indicate that plaintiff's diabetes was not being well controlled at that time.  The doctor attributed this in part to the plaintiff's being non-compliant with his diet (his weight had increased).  It was further noted that a more aggressive topical prescription and cleaning of the scrotal area would be required; plaintiff's diabetes needed to be better controlled;  and a Unna boot may be necessary for treatment of plaintiff's statis ulcer. *See* Plaintiff's Medical Records, p.192.  The next day, plaintiff was transferred to Allen Correctional Center and signed a "Consent to Medical Services" form dated September 1, 2005. *Id.*, p.191.

An intake medical examination was performed at Allen Correctional Center on September 1, 2005.  *Id.*, pp.188-190.  Plaintiff remained in the infirmary and was monitored by medical staff from September 1, 2005 until September 6, 2005. *Id.*, pp. 178-188.  On September 6, 2005, plaintiff was examined by Dr. T'Hart.  The medical notes from this examination indicate that plaintiff had no

4

complaints and wished to be discharged from the infirmary. *Id.*, p.177.   Dr. T'Hart did discharge plaintiff from the infirmary, but before doing so, she prescribed daily wet to dry dressing changes for plaintiff' right leg for 30 days. *Id.*   He was issued a Medical Pass dated September 6, 2005 which allowed him to go the infirmary for treatment until healed.  *Id.*, p.37. The progress note dated September 8, 2007 states that the swelling of plaintiff's testicles and scrotum had been resolved and that the medical staff was continuing treatment of plaintiff's venous statis ulcer on his right leg. *Id.*, pp. 44, 175.

On October 4, 2005, plaintiff was treated for an eye infection. *Id.*

Following the prescribed treatment for the statis ulcer, Dr. T'Hart recognized that the ulcer was not healing adequately.  Therefore, on or about October 27, 2005, she determined that plaintiff should be referred to the surgical clinic at the Huey P. Long Medical Center.  A letter requesting an appointment was sent to Huey P. Long. *Id.*, pp.173-74, 26.  On November 2, 2005, plaintiff was seen for the first time at Huey P. Long Hospital.  During that visit, plaintiff informed the doctor that he had a history of recurrent vascular statis ulcers for the last 7 years.  *Id.*, p.172.  Plaintiff was diagnosed as suffering from a venous statis ulcer; a Unna boot was applied; and plaintiff was scheduled for a follow-up appointment in 2 weeks.  *Id.,* pp.171-72.

Upon his return to Allen Correctional Center, plaintiff presented the orders from the outside physician for a Unna boot dressing and return visit to Huey P. Long to the medical staff at Allen Correctional Center, and Dr. T'Hart approved these orders. *Id.*, p.170.  Plaintiff was given a Medical Pass dated November 2, 2005, allowing him to go to the infirmary daily for baths until the Unna boot was removed. *Id.*, p.25.  Plaintiff continued his regular weekly visits to Huey P. Long for evaluation of the ulcer and changes to the Unna boot dressing for two months.  *Id.*, pp. 11-26, 129-174.  Dr.

T'Hart's note from December 15, 2005 states that plaintiff may continue follow-up with Huey P. Long for Unna boot "as long as it is necessary." *Id.*, p.148.  The progress notes from Huey P. Long dated December 21, 2005 state "wound almost healed." *Id.*, p.144.  The physician's report dated December 28, 2005 orders/recommends "Unna boot to RLE ulcer, RTC in 1 week; Jobst compression stocking to LLE." *Id.*, p.141.  Based upon this recommendation, Dr. T'Hart ordered a Jobst stocking for plaintiff on December 29, 2005.  *Id.*, p.138.

Concerning the treatment of plaintiff's diabetes, his medical records indicate that he had abnormal lab results on December 29, 2005. *Id.* pp. 138, 84-86.  On December 30, 2005, another note regarding abnormal lab results was entered.  It was determined that plaintiff was not fasting before his lab work.  In order to obtain accurate lab work for monitoring plaintiff's diabetes, Dr. T'Hart ordered plaintiff to spend the night in the infirmary so that he would fast the night before his morning blood work. *Id.*, p.138.  On January 3, 2006, plaintiff refused to comply with the directive to stay in the infirmary overnight in order to fast for morning blood work, and he signed a "Refusal to Accept Medical Care" form. *Id.*, p.131.

On January 4, 2006, plaintiff was taken to his weekly follow-up appointment for his statis ulcer at Huey P. Long.  While at Huey P. Long, plaintiff apparently advised the treating physician that he was suffering from boils in his genital area.[1]  He was admitted to Huey P. Long on January 4, 2006 for an incision and drainage of abscesses on his left posterior thigh and right shin. *Id.*, pp.8-10, 134, 128, 123.  He was given IV antibiotics and dressing changes while in the hospital. *Id.*, p.128.  He was discharged from the hospital on January 11, 2006 and returned to Allen Correctional

---

[1] Plaintiff claims that he developed these boils while housed in administrative lockdown from December 14, 2005-January 4, 2006.

Center.  *Id.*, pp. 7, 125.  Follow-up instructions given at the time of his discharge included: (1) Ibuprofen 600 mg for pain; (2) keep wounds clean/dry; (3) apply dressing daily; and (4) return to clinic in 3 weeks.  *Id.*, pp. 6, 123.

Upon his return to Allen Correctional Center, plaintiff was housed in the infirmary where he was monitored by medical staff. *Id.*, pp. 121-22.   On January 12, 2006, Dr. T'Hart evaluated plaintiff and prescribed (1) baths with diluted bleach; (2) wet-to-dry dressing changes daily; and (3) 800 mg Motrin twice a day for 2 weeks. *Id.*, p.120.  However, on January 13, 2006, plaintiff refused all treatment and signed a "Refusal to Accept Medical Care" dated January 13, 2006 wherein he refused "to stay in the infirmary for dressing changes, tub baths, vital signs, medication." *Id.*, p.116-119. He was discharged from the infirmary on January 13, 2006. *Id.*, p.117.

On January 24, 2006, medical staff referred plaintiff for an outside appointment to obtain a Jobst stocking.  *Id.*, p.115.  On January 26, 2006, plaintiff signed a "Refusal to Accept Medical Care,"stating that he already had a Jobst stocking. *Id.*, p.114.

On February 1, 2006, plaintiff was returned to Huey P. Long for a follow-up visit.  The doctor ordered daily dressing changes with gauze, support hose extending just above the knee, and a follow-up in 2 weeks. *Id.*, pp. 5, 110.  These orders were approved by Dr. T'Hart that same date. *Id.*, p.113.  A Medical Pass was issued to plaintiff on February 1, 2006, allowing him to go to the infirmary for daily dressing changes from February 1-14, 2006.  *Id.*, p.4.   Special medical instructions were also given for plaintiff to have ACE wraps from feet to above knees at all times. *Id.*  On February 2, 2006, treatment was administered as ordered.  *Id.*, p.83.  Plaintiff was returned to Huey P. Long on February 15, 2006.  At that time, it was determined that his right leg abscess was well healed and that his left posterior thigh abscess needed continued treatment. *Id.*, p.108.  It was

ordered that plaintiff return to Huey P. Long for a follow-up in one week on February 22, 2006. *Id.*, p.107.   On February 16, 2006, plaintiff's medical progress notes indicate that during the medical evaluation of his abscess, he was allowed to go to lunch and did not return. *Id.*, p.106.  It was also noted that had been a "no show" for his medication for over one month.  On February 16, 2006, a Medical Pass was given to plaintiff to go to the infirmary from dressing changes from February 16-March 2, 2006. *Id.*, p.2.  Plaintiff refused to return to Huey P. Long on February 22, 2006. *Id.*, p.105. The medical records further indicate that plaintiff failed to go to the infirmary on February 9, 21, 24, and 28 for dressing changes. *Id.*, p.83.

Plaintiff also alleges that he was denied previously prescribed insulin and blood pressure medication following his transfer to Allen Correctional Center.  With respect to this claim, plaintiff's medical records indicate that he was receiving 50 units of Humulin R Sq insulin twice a day while housed in Washington Correctional Institute. *Id.*, p.189.   However, after arriving at Allen Correctional Center, Dr. T'Hart applied her own sliding scale for insulin dosage and determined that plaintiff should receive 10 units of Humulin R Sq insulin twice a day.  *Id.*, pp. 91, 84-85, 89, 70, and 64.  On January 11, 2006, when plaintiff was discharged from Huey P. Long hospital, the doctor directed that plaintiff receive 20 units of insulin twice a day. *Id.*, p.124.  Regardless of the medical opinion concerning the amount of insulin that was appropriate, the medical records indicate that plaintiff did not take his prescribed insulin on a regular basis. *Id.*, p. 72 (September 2005); p.70 (October 2005); p.68 (October 2005); p.67 (December 2005); p.65 (January 2006); p.66 (February 2006).  Further, a progress note written in plaintiff's medical records dated March 28, 2006 states that plaintiff had refused to take the prescribed insulin.  Specifically, the note indicated that plaintiff refused to come out for his insulin dosage that date and that he was written up for "self-mutilation

due to missing 80 days of twice a day insulin while on the compound in a 90 day period." *Id.*, p.102. On March 29, 2006, a Medical Pass was issued requiring plaintiff to go to the infirmary for his insulin 2 times per day everyday. *Id.* p.1

In response to the defendants' arguments regarding continuous medical care of plaintiff and the lack of deliberate indifference, the plaintiff has come forward with an affidavit from plaintiff's wife, Suzanne Sikes, who is an Registered Nurse with a Bachelor of Science of Nursing degree. *See* Doc. 33, Exhibit A.  In her affidavit, Ms. Sikes states

1.    That in October, 2005 she informed the medical staff at Allen Correctional Center that the plaintiff had boils in the right groin area of his body. *Id., ¶* 5.

2.    That she has reviewed plaintiff's entire medical records maintained by Allen Correctional Center and that they are not entirely accurate.  *Id.*, ¶¶ 22-25.

3.    That plaintiff's medical records fail to document any wound care performed on plaintiff from August 31- October 25, 2005. ¶ 29.

4.    That prior to October 25, 2005, Dr. T'Hart did not order any type of medical treatment for plaintiff relative to his venous ulcers or his diabetes or any other medical condition.  ¶¶ 32-33.

5.    That during plaintiff's confinement in lockdown from October 25, 2005 through January 2, 2006, he received no medical assessment other than having his medication pushed through his jail cell door. ¶¶ 36, 37.

6.    That plaintiff's previously diagnosed boils continued to worsen while plaintiff was in lockdown such that he required surgery to treat this condition. ¶ 38.

7.    That plaintiff made numerous requests to Dr. T'Hart for medical treatment during his

9

confinement in lockdown but that Dr. T'Hart refused to even conduct a visual inspection of the problem area during this time. ¶ 39.

8.    That Dr. T'Hart only signed paperwork on January 2, 2006 allowing plaintiff to go to Huey P. Long Hospital because of her recognition that plaintiff required surgery for his boils.  ¶ 40.

9.    That plaintiff's medical condition could have been avoided if the medical staff at Allen Correctional Center had accepted her offer to provide plaintiff with Hibiclens soap.  ¶ ¶ 41, 42.

10.    That Dr. T'Hart and the medical staff at Allen Correctional Center did not follow the post-operative instructions of the surgical doctor, did not assist plaintiff in changing his wound dressing, and refused to evaluate plaintiff's post-operative wounds. ¶ ¶ 46, 47, 49, 50.

11.    That Dr. T'Hart refused to provide plaintiff with the necessary authorization to receive a prescription for Percocet. ¶ 48.

Additionally, the plaintiff has presented an affidavit from Dr. William Dupon, plaintiff's physician of choice who examined him at Allen Correctional Center.  Dr. Dupon also reviewed plaintiff's medical records.  In his affidavit, Dr. Dupon gives his opinion that "the level of care provided by Allen Correctional Center, and particularly, Dr. Barbara T/Hart and her staff, routinely and regularly fell below a reasonable standard of care, and that there are many demonstrated instances in which I believe Dr. T/Hart and her staff have shown 'deliberate indifference' to the medical needs of the plaintiff." *See* Doc. 33, Exhibit D.

10

## SUMMARY JUDGMENT PRINCIPLES

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  However, the movant does not need to negate the elements of claims on which the nonmoving parties would bear the burden of proof at trial.

The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case.  If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response.  If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  To meet this burden, the nonmovant must identify specific evidence in the record and articulate the precise manner in which that evidence supports its claims.  As to material facts on which the nonmovant will bear the burden of proof at trial, the nonmovant must come forward with evidence which would be sufficient to enable it to survive a motion for directed verdict at trial.  If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted. *Stults v. Conoco, Inc.*, 76 F.3d 651 (5th Cir. 1996).

The non-movant cannot satisfy this summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Wilson Industries, Inc. v. Aviva America, Inc.,* 185 F.3d 492, 493 (5th Cir. 1999), citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)(*en banc*).  Furthermore, it is noted that Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. *Stults, supra.*

## LAW AND ANALYSIS

Under the Eighth Amendment, prison officials are required to provide humane conditions of confinement including adequate medical care.  A lack of proper inmate medical care rises to the

11

level of a constitutional deprivation under the Eighth Amendment only if the evidence shows that the prison officials were "deliberately indifferent to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Farmer v. Brennan*, 114 S.Ct. 1970 (1994). It is only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," that constitutes conduct proscribed by the Eighth Amendment. *Estelle*, 97 S.Ct. at 291; *Gregg v. Georgia*, 96 S.Ct. 2909 (1976); *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1997).

In order to establish "deliberate indifference" the plaintiff must show that the defendant knew of and disregarded an excessive risk to an inmate's health or safety. *Farmer,* 114 S.Ct. at 1979; *see also Wilson v. Seiter*, 111 S.Ct. 2321, 2323 (1991). "Deliberate indifference is an extremely difficult standard to meet. Incorrect diagnosis, by itself, is insufficient to past muster. 'The plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Lee v. Stalder,* 223 Fed.Appx. 315, 318, 2007 WL 760725, *2 (5th Cir. 2007)(internal cites omitted); *Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir. 2006)*; Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985).

The fact that a plaintiff does not believe that his medical treatment was as good as it should have been is not a cognizable complaint under the Civil Rights Act.  Prisoners are not constitutionally entitled to the best medical care that money can buy. *See Mayweather v. Foti,* 958 F.2d. 91 (5th Cir. 1992).  The existence of continuous medical care normally precludes a finding of

deliberate indifference on the part of prison officials. *Banuelos v. McFarland,* 41 F.3d 232, 235 (5th Cir. 1995); *Mayweather, supra.* Furthermore, a prisoner's disagreement with the course of treatment offered and/or unsuccessful treatment do not establish that a constitutional violation has occurred. *See  Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1999); *Norton v. Dimazana*, 122 F.2d 286, 292 (5th Cir. 1997); *Callaway v. Smith County*, 991 F. Supp. 801, 809 (E.D. Tex. 1998); *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985); *Mayweather, supra; Varnado v. Lynaugh,* 920 F.2d 320, 321 (5th Cir. 1992) citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

The plaintiff's medical records refute the his allegations and Ms. Sikes' statements that plaintiff received no medical treatment between the date of his arrival at Allen Correctional Center and October 25, 2005.  Plaintiff arrived at Allen Correctional Center on September 1, 2005.  At that time, he was admitted to the infirmary and monitored by medical staff until September 6, 2005. *See* Plaintiff's Medical Records, pp.178-188.  As detailed above, plaintiff was first examined by Dr. T'Hart on September 6, 2005.  On that date, Dr. T'Hart noted in plaintiff's medical records that he made no complaints and that he requested to be discharged from the infirmary.  Plaintiff was discharged from the infirmary, prescribed daily wet to dry dressing changes, and given a Medical Pass to allow him to go to the infirmary until healed. *See* Plaintiff's Medical Records, pp.37, 177. Plaintiff's medical records further reveal that the medical staff administered prescribed medication (including insulin for his diabetes) to plaintiff during this time, treated plaintiff for an eye infection, and followed plaintiff's medical condition of swollen testicles and scrotum to resolution. *Id.,* pp. 44, 71, 72, 175.  While the plaintiff's medical records do not establish that plaintiff actually visited the infirmary on a daily basis for the prescribed dressing changes, the plaintiff has come forward with

13

no summary judgment evidence to establish that he was prevented from doing so by the defendants or that they showed deliberate indifference to his serious medical needs by refusing to treat him when he presented himself for treatment.

The plaintiff's medical records further refute plaintiff's allegations and Ms. Sikes' statement that plaintiff received no medical assessment from October 25, 2005 through January 2, 2006.  As discussed above, the plaintiff made weekly visits to the Huey P. Long Hospital from November 2, 2005 through January 4, 2006.  Additionally, plaintiff was given a Medical Pass dated November 2, 2005 which allowed him to go to the infirmary on a daily basis for baths until the Unna boot was removed.  *Id.*, p.25.  During this time, a Jobst stocking was ordered for plaintiff. *Id.*, p.138.

To the extent that the plaintiff attempts to establish deliberate indifference on the part of the defendants by means of reliance on Ms. Sikes' statements in her affidavit, this attempt fails. Initially, the court notes that several of Ms. Sikes' statements are excluded from evidence as hearsay.[2] *See* F.R.E. Rule 801.   Secondly, many of Ms. Sikes' statements lack a factual basis.  There is no evidence before the court to establish that plaintiff's boils had been previously diagnosed.  *See*

---

[2]Some examples of the hearsay nature of Ms. Sikes' affidavit are as follows:

(1)      her statement that plaintiff sought and was refused medical attention while he was in lockdown. *See* Plaintiff's Exhibit A, ¶ 39.  This statement, offered to prove the truth of the matter asserted, is classic hearsay.  Ms. Sikes was not present at the time of these alleged requests, and plaintiff, who is the alleged declarant, is available to offer his sworn testimony on this matter;

(2)      her statement that "on January 2, 2006,  Dr. T'Hart realized that her previous intentional and knowing deliberate indifference to [plaintiff's] medical needs could not be corrected internally; accordingly, she was compelled o sign the necessary paperwork to have [plaintiff] taken to Huey P. Long Hospital for medical treatment to save his life." *See* Plaintiff's Exhibit A,  ¶ 40.  Sikes is offering her own assessment as a statement of fact to prove Dr. T'Hart's state of mind.  Further this statement has no factual basis in the record, as the medical records establish that January 4, 2006 was a regularly scheduled follow-up appointment for plaintiff.  Further, Ms. Sikes points to nothing in the record which indicates that Dr. T'Hart became aware of plaintiff's boils prior to his visit to Huey P. Long on January 4, 2006.

Plaintiff's Exhibit A, ¶ 38.  Further, Ms. Sikes' claims in her affidavit that she notified the medical staff that plaintiff had boils in his groin area in October 2005, however, there is nothing in the medical records to establish that plaintiff ever made any complaints to medical staff regarding this condition or that he sought medical care for this condition which was denied.  Between this time and January, 2006, plaintiff received medical care on a weekly basis and was approved for daily visits to the infirmary.  Thus, it would have been very easy for him to notify medical staff at either Allen Correctional Center or Huey P. Long Hospital of any type of condition requiring medical treatment.

Likewise, Ms. Sikes' statement that the doctor's post-operative instructions were not followed also lacks a factual foundation and is contradicted by the medical record.  Dr. T'Hart's post-operative instructions almost mirrored those of the treating physician at Huey P. Long Hospital. *See* Plaintiff's medical records, pp. 120, 123.  Further, even if Dr. T'Hart had not followed the instructions of the Huey P. Long physician, her decision regarding the course of treatment would not amount to deliberate indifference. *Gobert v. Caldwell,* 463 F.3d at 350 ("Considering and failing to follow the recommendations of another treating physician does not amount to deliberate indifference."); *Stewart v. Murphy*, 174 F.3d at 535.

Ms. Sikes' attempt to call into question the accuracy and veracity of the medical records also fails.  She claims that the medical records inaccurately report that plaintiff was present at Allen Correctional Center on January 4, 5, and 6, 2006.  However, a review of the records reveals that the medical records actually report that plaintiff was present on the morning of January 4 and that he was in the hospital on January 5 and 6, 2006. *See* Plaintiff's Medical Records, p.126.  Plaintiff's presence at Allen Correctional Center on the morning of January 4 is not inconsistent with his admission to

15

the hospital later that date. Further, the defendants point out that the exhibit cited by the plaintiff to support this proposition actually refers to a date in 2004, not 2006.

Lastly, Ms. Sikes' opinion regarding a better course of treatment for plaintiff is not sufficient to establish deliberate indifference on the part of the defendants. *Gobert v. Caldwell,* 463 F.3d at 346 ("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."); *see also Banuelos*, 41 F.3d at 235; *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir.1991); *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999); *Stewart v. Murphy*, 174 F.3d at 537.

Additionally, the court notes that the plaintiff cannot rely on expert medical testimony to create a genuine issue of material fact regarding what Dr. T'Hart and the medical staff actually knew. *Gobert v. Caldwell*, 463 F.3d at 348, n.29 ("expert testimony cannot create a question of fact as to what Caldwell actually knew."); *see also Campbell v. Sikes*, 169 F.3d 1353, 1368 (11th Cir.1999). Thus, Dr. Dupon's and Ms. Sikes' opinions that the defendants acted with deliberate indifference is not sufficient to enable the plaintiff to avoid summary judgment when the evidence before the court fails to establish that Dr. T'Hart actually knew of plaintiff's boils in his genital area and disregarded the risk that they presented to his health or that she acted with deliberate indifference to plaintiff's venous statis ulcers or diabetes.  Furthermore, to the extent that Dr. Dupon can testify regarding the standard of care, his deposition testimony indicates that in his opinion, plaintiff was provided with the appropriate treatment for his venous ulcers, i.e. Unna boots and compression stockings, and that plaintiff did not suffer any physical injury as a result of the medical care received

at Allen Correctional Center.[3] *See* Defendants' Exhibit 1, pp.23, 45.  Dr. Dupon only recommended that plaintiff be transferred to another correctional facility with a more comprehensive medical facility as a precautionary measure to avoid future problems which may arise in connection with plaintiff's diabetes. *Id.*, pp.42, 43, 45.

Because the evidence before this court does not establish the "level of egregious intentional conduct required to satisfy the exacting deliberate indifference standard," this court finds that the facts "cannot as a matter of law support a finding of a violation of [plaintiff's] constitutional right to be free of cruel and unusual punishment." *Gobert v. Caldwell*,  463 F.3d at 351-52.

Accordingly,

IT IS RECOMMENDED that the Motion for Summary Judgment filed on behalf of the defendants be GRANTED and that this civil rights action be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have ten (10) business days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN**

---

[3]Dr. Dupon's deposition testimony is as follows:

Q.      All right.  Now as we sit here today, your review of the medical records, your evaluation of Mr. Thurman, you would agree with me that there's no indication that he suffered any kind of physical injury as a result of the medical care he's received at Allen Correctional Center?

A.      From looking at his venous statis ulcers and healing, I would have to agree.
*See* Doc. 32, Defendant's MSJ Exhibit 1, Dr. Dupon's Deposition, p.45.

**ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.**

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, October 12, 2007.

ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE